**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DOMINION RESOURCES, INCORPORATED,
Plaintiff-Appellee,

v.                                                              No. 99-1636

UNITED STATES OF AMERICA,
Defendant-Appellant.

DOMINION RESOURCES, INCORPORATED,
Plaintiff-Appellant,

v.                                                              No. 99-1645

UNITED STATES OF AMERICA,
Defendant-Appellee.

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CA-97-326)

Argued: May 1, 2000

Decided: July 19, 2000

Before MOTZ and TRAXLER, Circuit Judges, and
Frank W. BULLOCK, Jr., United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Traxler and Judge Bullock joined.

_____

**COUNSEL**

**ARGUED:** Charles Bricken, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Virginia W. Powell, HUNTON & WILLIAMS, Richmond, Virginia, for Appellee. **ON BRIEF:** Loretta C. Argrett, Assistant Attorney General, Helen F. Fahey, United States Attorney, Richard Farber, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Dominion Resources, Inc. (DRI), which owns all of the stock of a regulated public utility, incurred two significant expenses in 1991 for which it claimed entitlement to a tax benefit. The first expense arose when regulatory authorities required DRI to restore to its customers approximately $10 million in previous rate overcharges upon which DRI had paid taxes during a thirteen year (1975 through 1987) period. Pursuant to 26 U.S.C. § 1341 (1994), DRI sought, but was denied, a refund of $1,204,283 in income tax payments that it had made on the $10 million in prior tax years. DRI incurred the second expense when it spent approximately $2.2 million on environmental cleanup of a property that it had formerly used as a power plant. The company sought to deduct these costs as an "ordinary and necessary business expense" under 26 U.S.C. § 162 (1994 & Supp. IV 1998) and thereby obtain a refund of $764,135. The IRS disallowed the deduction and required DRI to treat the cleanup costs as a capital expenditure.

DRI brought this suit seeking both refunds. Following a bench trial, Judge Payne issued a thorough opinion holding in favor of DRI on the first issue and granting the $1,204,283 refund, but finding in favor of the IRS on the second issue, and so denying the $764,135 refund. See Dominion Resources, Inc. v. United States, 48 F. Supp. 2d 527 (E.D. Va. 1999). Both DRI and the United States (often referred to within as the IRS) appeal. For the reasons set forth below, we affirm.

2

I.

DRI's entitlement to the larger claimed refund depends on the proper interpretation of § 1341 of the Internal Revenue Code. See 26 U.S.C. § 1341.

A.

The relevant facts underlying this claim are undisputed and fully detailed in the district court's opinion. We set forth only the facts necessary to understand the legal issues. DRI, a Virginia corporation, owns directly or indirectly all of the common stock of Virginia Electric and Power Company, a public utility engaged in the production and sale of electricity in North Carolina and Virginia. (For convenience, in this section we refer to DRI and Virginia Power simply as DRI.) DRI's gross income from its electric utility business is a function of the electricity rates it charges its customers.

The Federal Energy Regulatory Commission (FERC) and the North Carolina Utilities Commission (NCUC) regulate DRI's rates. FERC and NCUC permit a utility to bill its customers, as part of the overall cost of service, a charge reflecting the utility's projected liability for federal income taxes. This charge may cover not only the payment of current taxes, but future tax liability as well. DRI imposed such a charge in order to phase in the cost of anticipated liabilities in future years when favorable timing differences between its tax and book accounting would reverse. Many public utilities have established similar reserve accounts to meet deferred income tax liability.

In 1986, Congress reduced the maximum corporate tax rate from 46% to 34%, with an intermediate rate of 39.95% applicable to the 1987 taxable year. As a result, DRI's reserve account for deferred tax liability contained an excess of approximately $10 million, an amount obtained from customers during the taxable years between 1975 and 1987 in anticipation of the tax rate remaining at 46%. In 1991, FERC and NCUC ordered DRI to remit the $10 million in the form of a one-time payment to DRI customers, either through an immediate credit to each customer's bill, or by check or wire transfer. DRI did not restore the $10 million to exactly the same individuals who had paid the deferred tax charges between 1975 and 1987. Instead, the $10 mil-

3

lion went to DRI's customers in 1991. Individuals and corporations who moved out of DRI's service area between 1975 and 1991 thus did not receive compensation for any overpayments they had made to DRI between 1975 and 1987 (although, as DRI points out, they may have received similar compensation from the utility serving their new residence or business). Furthermore, the remittance was allocated on the basis of the 1991 customers' electricity use during the preceding 12 months, not on the basis of electricity use between 1975 and 1987.

The $10 million repayment reduced DRI's net income in 1991, and this, in turn, reduced DRI's overall tax liability by approximately $3.4 million (34% x $10 million) for that tax year. The issue here is whether DRI is entitled to invoke § 1341 to obtain from the government an additional $1.2 million deduction, an amount that would restore in full the approximately $4.6 million DRI paid in taxes on the $10 million under the pre-1987 tax rate (46% x $10 million).

Congress enacted § 1341 in response to the Supreme Court's decision in <u>United States v. Lewis</u>, 340 U.S. 590 (1951), which held that a taxpayer had to report income he received under an unrestricted claim of right in the year he received it, and if, in a subsequent year, it was determined that the taxpayer was not entitled to the income, his only option was to deduct the amount of that income in the year of repayment--he could not recalculate his income for the year of receipt. <u>See</u> H.R. Rep. No. 83-1337, at A294 (1954), <u>reprinted in</u> 1954 U.S.C.C.A.N. 4017, 4436; S. Rep. No. 83-1622, at 451 (1954), <u>reprinted in</u> 1954 U.S.C.C.A.N. 4621, 5095. "In many instances . . ., the deduction allowable in the later year d[id] not compensate the taxpayer adequately for the tax paid in the earlier year." <u>Id.</u> at 118, <u>reprinted in</u> 1954 U.S.C.C.A.N. at 4751; <u>see also</u> H.R. Rep. No. 83-1337, at 86, <u>reprinted in</u> 1954 U.S.C.C.A.N. at 4113. To relieve this "inequit[y]," Congress enacted § 1341, which permits taxpayers in this situation who meet certain requirements "to recompute their taxes for the year of receipt" if they choose to do so. <u>United States v. Skelly Oil Co.</u>, 394 U.S. 678, 682 (1969). In sum, § 1341 is designed to put the taxpayer in essentially the same position he would have been in had he never received the returned income.

Section 1341 provides in pertinent part:

4

(a) General Rule.--If--

(1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;

(2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

(3) the amount of such deduction exceeds $3,000,

then the tax imposed by this chapter for the taxable year shall be the lesser of the following:

(4) the tax for the taxable year computed with such deduction; or

(5) an amount equal to--

   (A) the tax for the taxable year computed without such deduction, minus

   (B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

26 U.S.C. § 1341(a).

In other words, as the parties agree, to obtain the benefit of § 1341, the following requirements must be met: 1) the taxpayer must appear to have had an unrestricted right to an item included in gross income

5

for a prior taxable year; 2) it must have been established after the close of that prior year that the taxpayer did not have an unrestricted right to the item; 3) the taxpayer must be entitled to deduct the amount of the item; and 4) the amount of the deduction must exceed $3000.

The statute further provides that although its relief does not apply to deductions resulting from inventory sales or sales of stock in trade, it does apply if the deduction "arises out of[government required] refunds or repayments with respect to rates made by a regulated public utility." 26 U.S.C. § 1341(b)(2). Congress thus ensured that a regulated public utility, like DRI, would be able to benefit from § 1341 when forced by a regulatory authority to refund rate payments to its customers, if the utility otherwise complied with the requirements of § 1341.

In this case, the IRS concedes that § 1341's fourth requirement has been met--the amount of the asserted deduction exceeds $3000. The IRS argues, however, that it did not "appear" that DRI had an unrestricted right to the $10 million item of gross income in a prior tax year, nor was it "established" after the close of that year that DRI "did not have an unrestricted right to such item" (the first and second requirements). Brief of Appellant/Cross Appellee at 10-12. Furthermore, the IRS argues, DRI was not entitled to take a deduction for the $10 million (the third requirement). Id. at 13.

B.

The IRS first contends that DRI did not "appear" to have an unrestricted right, as required by § 1341(a)(1), but rather had a disqualifying "actual" unrestricted right to the income throughout the taxable years in question. The change in law that formed the basis of FERC and NCUC's later determination that DRI did not have a right to the $10 million--the reduction in the corporate income tax rate to 34%-- did not take full affect until the 1988 taxable year; during the 1975 through 1986 tax years the corporate income tax continued to be 46%, and in 1987 it was reduced to 39.95%. Thus, the IRS maintains, because DRI had an "actual" rather than "apparent" right to the income between 1975 and 1987, the utility cannot avail itself of § 1341.

6

The IRS candidly concedes that neither the statute nor its implementing regulation, Treas. Reg. § 1.1341-1,"explicitly state[ ] whether the determination that the taxpayer did not have an unrestricted right to the income in question has to be based on facts that existed as of the close of the taxable year in which the taxpayer received the income, or could instead be based on events that occurred after the close of the taxable year of receipt." Brief of Appellant/Cross-Appellee at 10-11. Maintaining that§ 1341 and its implementing regulation are "ambiguous," id. at 18, the IRS asks us to interpret the statute as it has in published revenue rulings.

The plain language of § 1341 does not require the construction the IRS suggests. Notably, the statute does not require that the facts according to which the taxpayer lacks an unrestricted right to certain income must have existed in the prior tax year. Nor does the statute make the distinction that the IRS presses between, on one hand, the "facts" that form the basis for a later determination that the taxpayer lacks an unrestricted right, and, on the other hand, the "event" that establishes the existence of these "facts." This does not, however, necessarily mean that the statutory language is ambiguous. All that § 1341(a)(1) requires is that "an item[be] included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item." Things very often "appear" to be what they "actually" are. As a matter of plain meaning, the word "appeared" generally does not, as the IRS urges, imply only false appearance, and generally does not exclude an appearance that happens to be true.**1**

_____

**1** We find meritless the IRS's contention that absent its interpretation of the statute, the words "it appeared that" are superfluous. On the contrary, without that phrase, the statute would provide relief only to a taxpayer who actually had an unrestricted right to an item of income. Thus the phrase "it appeared that" broadens what would otherwise be an extremely narrow provision. Congress's intent to provide tax relief not only to taxpayers who actually had an unrestricted right to income, but also to those who merely seemed to, is clear from the fact that Lewis, 340 U.S. at 590, the case that triggered Congress's enactment of § 1341, involves precisely such a taxpayer. Without the"it appeared that" language, § 1341 would not eliminate the "inequit[y]," Skelly Oil, 394 U.S. at 681, suffered by such taxpayers.

Nor are we persuaded by the IRS's contention that the use of the past tense in the statute's second requirement--that "it was established after the close of such prior taxable year (or years) that the taxpayer <u>did</u> not have an unrestricted right to such item," § 1341(a)(2) (emphasis added)--limits the availability of relief under the statute to taxpayers whose unrestricted rights to income ended during the prior taxable year in question. In effect, the IRS would have us read the statute as follows: "it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item [<u>during the prior taxable year (or years)</u>]." We conclude, however, that the word "did" can more naturally be read to parallel the use of the past tense in the phrase, "it was established"; that is, "did" more likely refers to the moment, "<u>after</u> the close of such prior taxable year (or years)," when the lack of an unrestricted right "was established." The latter interpretation seems more plausible than the former and would not require any judicial additions to the statutory language.

Another difficulty with the IRS's interpretation of § 1341(a) is that it seems at odds with § 1341(b)(2). There Congress expressly provided that although generally § 1341 does not apply to deductions allowable with respect to sales of stock in trade,"or property held by the taxpayer primarily for sale to customers," this exception does not prevent a public utility from obtaining the benefit of § 1341 for a deduction arising out of government-ordered rate"refunds or repayments." 26 U.S.C. § 1341(b)(2). A situation does not readily come to mind in which, under the IRS's reading, the statute would apply to a public utility refund or repayment. Asked at oral argument to posit such a situation, the IRS suggested that § 1341 might apply if a rate that was clearly "provisional" had been charged but later was retroactively adjusted to the beginning of the taxable year in question for reasons connected to its provisional character. The only other possibility that occurs to us would be if a regulatory authority gave a utility permission to charge its customers an inappropriate rate for service based on some kind of error by the regulatory authority that neither it, the utility, nor the public detected. It seems quite implausible that Congress would specifically authorize public utilities to benefit from § 1341 if the situations in which they could obtain such a benefit were so limited.

8

In sum, the plain language of § 1341 offers little support for the IRS's position, and we are unconvinced that the statute is "ambiguous." Rather, taking the statute as a whole, it seems to us to permit taxpayers like DRI to avail themselves of its benefits. Moreover, even if the statute were ambiguous, the IRS's suggestion that we resolve this "ambiguity" by resort to its revenue rulings rather than first focusing on the statute's legislative history is ill-considered.

When a court reviews an agency's construction of a statute that is not plain on its face, the court must initially attempt to determine the intent of Congress. See Elliott v. Administrator, Animal & Plant Health Inspection Serv., 990 F.2d 140, 144 (4th Cir. 1993). "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect" notwithstanding any contrary agency interpretation. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n.9 (1984). The statute's legislative history is the first tool of statutory construction a court utilizes to determine congressional intent when statutory language is unclear. See Toibb v. Radloff, 501 U.S. 157, 162 (1991).

In this case, the legislative history indicates that Congress did not intend § 1341 to operate as the IRS suggests. Both the House and Senate Committee Reports accompanying § 1341 state that the statute will apply "[i]f the taxpayer included an item in gross income in one taxable year, and in a subsequent taxable year he becomes entitled to a deduction because the item or a portion thereof is no longer subject to his unrestricted use." H.R. Rep. No. 83-1337, at A294, reprinted in 1954 U.S.C.C.A.N. at 4436; S. Rep. No. 83-1622, at 451, reprinted in 1954 U.S.C.C.A.N. at 5095 (emphasis added). Not only does this statement provide no support for the reading of the statute that the IRS favors, but the verb tenses clearly indicate that Congress did not intend the IRS's interpretation. The use of the present tense in the committee reports strongly suggests that a taxpayer may enjoy the benefits of § 1341 even if his unrestricted right to use the income did not end until the "subsequent taxable year." There is no suggestion that the end of the prior taxable year functions as any kind of restraint on the relief available under the statute.

9

In the face of the legislative history of § 1341, which we believe effectively eliminates any ambiguity the IRS perceives in the statute, we cannot defer even to a contrary regulation of the IRS. See Chevron, 467 U.S. at 843-44. In this case, however, the IRS relies not on a regulation but rather on a small group of revenue rulings now more than thirty years old. See Rev. Rul. 69 115, 1969-1 C.B. 50; Rev. Rul. 67-437, 1967-2 C.B. 296; Rev. Rul. 67-48, 1967-1 C.B. 50; Rev. Rul. 58-456, 1958-2 C.B. 415; Rev. Rul. 58-226, 1958-1 C.B. 318.[2] Yet, revenue rulings are entitled to considerably less deference than an agency's properly promulgated regulations, see, e.g., Estate of McLendon v. Commissioner, 135 F.3d 1017, 1023-24 (5th Cir. 1998); indeed, the tax court refuses to afford them any deference at all, regarding them as "merely the contention of one of the parties to the litigation." Estate of Smead v. Commissioner , 78 T.C. 43, 47 n.5 (1982); see also Christensen v. Harris County , 120 S. Ct. 1655, 1662-63 (2000) (holding that agency opinion letters are entitled to "respect" but "do not warrant Chevron-style deference"). To the extent that the revenue rulings support the IRS's position, we certainly cannot follow them when they are arguably contrary to the plain language of the statute and quite clearly contrary to congressional intent as demonstrated by the statute's legislative history.

Undoubtedly, the IRS seeks to rely on this handful of dated revenue rulings because they constitute the only published authority of any sort that has adopted the IRS's interpretation of § 1341(a). Although the tax court has on occasion denied certain taxpayers the right to avail themselves of § 1341, it has never adopted the IRS's dis-

_____

[2] One of these revenue rulings does not adopt the IRS's theory that a taxpayer must have an apparent, and not actual, unrestricted right to income. In the situation discussed in Revenue Ruling 58-456, stockholders who received dividends from a corporation organized to build and operate property under the National Housing Act paid income tax on the dividends in the year of receipt. Five years later, the Federal Housing Administration required the stockholders to refund the dividends. Revenue Ruling 58-456 concluded that the stockholders could avail themselves of § 1341 because the repayment was"involuntary." The revenue ruling does not rely on or even discuss whether the stockholders were actually or only apparently entitled to the income in the year of receipt or whether "prior facts" or "subsequent events" divested them of that entitlement.

10

tinction between actual versus apparent claims of right as the basis for such decisions. See, e.g., Pahl v. Commissioner, 67 T.C. 286 (1976); Blanton v. Commissioner, 46 T.C. 527 (1966), aff'd, 379 F.2d 558 (5th Cir. 1967).**3**

Moreover, both circuits that have considered a similar IRS contention with respect to § 1341(a) have flatly rejected it. See Van Cleave v. United States, 718 F.2d 193, 197 (6th Cir. 1983) (rejecting "[t]he government's position," which "was identical" to that rejected in Prince v. United States, 610 F.2d 350, 352 (5th Cir. 1980), that § 1341 "was not available . . . because the taxpayer had an unrestricted right to the income in the year of receipt, not just the appearance of a right"). In Van Cleave, the court held that a taxpayer, who had accepted compensation from a corporation on the condition that the IRS not find the compensation excessive for corporate tax purposes, was entitled to a refund under § 1341 when, after the close of the taxable year, the IRS did find the compensation excessive. In Prince, the court held that a taxpayer, who was the beneficiary of a trust, was entitled to a refund under § 1341 when, after the close of the taxable year, the Alabama Supreme Court ruled that certain income from the trust should have been paid to the trustee rather than the beneficiary.

The IRS now attempts to distinguish Van Cleave and Prince on the ground that all of the "facts" that divested the taxpayers in those cases of their rights to the income existed during the prior taxable year. When litigating those cases, IRS unsuccessfully argued that certain

_____

**3** The Supreme Court has not directly addressed the question, but it has indicated that taxpayers in DRI's position--adversely affected by a change in tax rates after the year in which income was received--suffered the "inequities" that § 1341 attempted to correct. See Skelly Oil, 394 U.S. at 681 (noting that under the claim of right doctrine prior to enactment of § 1341, "the tax benefit from the deduction in the year of repayment might differ from the increase in taxes attributable to the receipt; for example, tax rates might have changed"). Here, of course, the change in the tax rate not only caused the tax benefit in the year of repayment to be less than the amount DRI initially paid in taxes in the year of receipt, it also precipitated DRI's obligation to forego the income in the first place.

11

"facts"--the rulings of the Alabama Supreme Court (in <u>Prince</u>) and the IRS itself (in <u>Van Cleave</u>)--disqualified the taxpayer from § 1341 relief because they occurred after the close of the taxable year. The IRS now describes these same "facts" as "events" which merely "established" facts that existed during the prior taxable year. We see no indication whatsoever that Congress intended to make such a subtle distinction. The statutory text and legislative history do not support the IRS's view that the appearance of an unrestricted right to the income must have ended due to "facts" occurring during the prior taxable year. The IRS's attempt to reconcile its current view with <u>Van Cleave</u> and <u>Prince</u>, by arguing that the adjudicative decisions in those cases merely "established" the relevant"facts," but were not "facts" themselves, finds even less support in the plain language and history of § 1341.

Although we must reject the IRS's restrictive construction of § 1341(a), we recognize its legitimate concern that a loose interpretation of the statute would leave uncertain the tax status of any item of gross income for an indefinite number of years after the taxable year in which the income was earned. Of course, when Congress enacted § 1341, it intentionally and consciously created an exception to the annual accounting system. The IRS contends that although Congress obviously intended to remove an unfairness caused in one particular situation by the annual accounting system, nothing indicates that Congress intended to "wreak havoc" with the system that is otherwise an "integral part of the tax code." <u>Skelly Oil</u>, 394 U.S. at 681. Virtually ignored by the IRS, however, is the tax court's formulation of a rule that provides appropriate, workable limits on § 1341: "the requisite lack of an unrestricted right to an income item permitting deduction must arise out of the circumstances, terms, and conditions of the original payment of such item to the taxpayer." <u>Pahl</u>, 67 T.C. at 290 (quoting <u>Blanton</u>, 46 T.C. at 530); <u>see also Kraft v. United States</u>, 991 F.2d 292, 295 (6th Cir. 1993); <u>Bailey v. Commissioner</u>, 756 F.2d 44, 47 (6th Cir. 1985).

Courts have had little difficulty in applying the"same circumstances" rule.**4** For example, a doctor who earned medical fees in one

_____

**4** Indeed, we believe that the"same circumstances" inquiry, although obviously no bright line rule, actually provides an easier means to limit

12

tax year was denied § 1341 relief when in a later year he entered into a plea agreement to pay restitution because of medicaid fraud. See Kraft, 991 F.2d at 295. Similarly, a corporate officer was not allowed to employ § 1341 when, years after earning dividends, salary, and bonuses, he incurred a civil penalty for violations of an FTC order. See Bailey, 756 F.2d at 47. In that case, the court explained, "the amount of the penalty was not computed with reference to the amount of his salary, dividends, and bonuses, and b[ore] no relationship to those amounts." Id. In other cases, corporate employees have not been permitted to benefit from § 1341 when, after receipt of their salaries, they voluntarily agreed to return them if the IRS determined that the salaries were excessive. See Pahl, 67 T.C. at 290; Blanton, 46 T.C. at 530; cf. Van Cleave, 718 F.2d at 194 (taxpayer's receipt of salary conditioned from the outset on IRS not finding the salary excessive).

Here, as in Van Cleave and Prince, DRI's loss of an unrestricted right to income did arise out of the same circumstances as the original payment of the income in question. Both DRI's authorization from regulatory authorities to collect the $10 million and its obligation to repay that amount arose from DRI's liability to the federal government for deferred income taxes. Although DRI's right to keep the income was not explicitly conditioned on the tax rate remaining at 46%, from the outset the tax rate was an obvious and central circumstance under which the regulatory authorities permitted DRI to collect the $10 million. As one DRI official testified,"our expectation was

_____

§ 1341 than the IRS's restrictive interpretation of the statute. Distinguishing, as the IRS would, between the "facts" under which the taxpayer does not have an unrestricted right to the income and the "events" that establish the existence of these facts seems particularly troublesome. For example, in this case the "facts" under which DRI did not have an unrestricted right to the income in question did, in some sense, exist during the prior taxable years in question. DRI's charges for deferred tax payments were premised entirely on a corporate tax rate of 46%. The only new happenings, subsequent to the taxable years in question, were the revision to the tax code that reduced the maximum corporate income tax rate and the regulatory authorities' orders that DRI pay back $10 million to its customers. Arguably the revision to the tax code was an "event" that established the fact that DRI had overcharged its customers rather than a "fact" itself. And, even under the IRS's view, the regulatory authorities' orders were clearly "events," not"facts."

13

all along that if there was any excess [collection for] deferred taxes resulting from the tax decrease that those amounts would be refunded to customers or returned to customers." Certainly anyone familiar with public utility regulation would have shared that expectation.

For these reasons, we conclude that DRI did satisfy the first two requirements of § 1341. It did "appear that" DRI had an unrestricted right to the $10 million between 1975 and 1987, and it was established in a later year that DRI did not have an unrestricted right to that same item of income. The IRS's cramped construction of § 1341 simply does not find adequate support in the plain language of the statute, its legislative history, or the case law interpreting it. Accordingly, we must reject that construction.

C.

The IRS, however, also contends that DRI cannot avail itself of § 1341 because DRI's 1991 repayment of $10 million to its customers did not constitute a deductible expense as required by § 1341(a)(2). DRI maintains, and the district court found, that the $10 million repayment constituted a refund to its customers deductible as an ordinary and necessary business expense under 26 U.S.C. § 162(a).

The IRS does not argue that a true customer refund is not deductible; it clearly is. See, e.g., Skelly Oil, 394 U.S. at 683-84 (assuming deductibility of customer refunds as either business expense under § 162 or loss under § 165). What the IRS claims is that the $10 million was not a true customer refund but rather an adjustment in rates to compensate for previous overcharges, which is not a deductible business expense. See Roanoke Gas Co. v. United States, 977 F.2d 131 (4th Cir. 1992); see also Iowa Southern Utils. Co. v. United States, 841 F.2d 1108 (Fed. Cir. 1988); Southwestern Energy Co. v. Commissioner, 100 T.C. 500 (1993). The question then, is whether the payments at issue here are true customer refunds or mere rate reductions.

Undeniably, the $10 million payment has some elements of both. On one hand, the payment here, unlike the rate reductions in Roanoke Gas, was a one-time, lump-sum payment. In Roanoke Gas, a utility restored overcharged amounts to customers through the reduction of

14

rates over a one-year period. 977 F.2d at 134; see also Iowa Southern, 841 F.2d at 1110 (repayment accomplished through a rate reduction over 30 years). Accordingly, we observed that the rate adjustment at issue in that case was "not an obligation to pay at all. Rather, it implement[ed] a policy to allocate income on the books of the utility to a given year in order to match income and costs more accurately." 977 F.2d at 136. We explained that the utility had not "segregated the funds, or imposed limitations on its use of the money, or at least paid interest on the funds ultimately returned." Id.

In the present situation, the repayment took an entirely different form. Regulatory authorities ordered DRI, not to restore the funds to its customers through a rate reduction, but instead through a one-time payment. The payment of the $10 million at one time through checks or credits noted on customers' bills obviated any need to segregate the funds, impose limitations on their use, or pay interest during a period of repayment. In sum, unlike the repayment method in Roanoke Gas, DRI's payment to its customers actually took the form of a refund.

On the other hand, like the payments at issue in Roanoke Gas and Iowa Southern, the repayments here were not made to the precise group of customers who had originally been charged. DRI distributed the overcharge amount to its current customers on the basis of their electricity use during the preceding 12 months. In Roanoke Gas, the utility's rate reduction benefitted its current customers, and we found the failure to match the benefits of the rate reduction to the past customers who had actually been overcharged to be indicative that the repayment should not be viewed as a refund. 977 F.2d at 135-36. In Roanoke Gas, however, the period in which the charges were imposed was a short one--1984-86; here it was thirteen years. In view of this, Judge Payne found that a precise match between past customers and the appropriate refund was "not possible." 48 F. Supp. 2d at 544 n.10. He found that in this case "the refunds were allocated to actual customers where possible or to the classes of customers which had made the overpayments, thereby `matching-up' the refunds to the overpaying customers to the extent that it was feasible to do so." Id. at 544.

The IRS does not contend that these findings are clearly erroneous, and our review of the record reveals that they are indeed well supported. The IRS nonetheless maintains that, feasible or not, if the

15

repayments were not made to the precise customers who overpaid, they do not constitute refunds. Although this argument has superficial appeal, we believe that a fair reading of § 1341 indicates that Congress did not intend to deny relief to a public utility on these grounds, but rather intended that payments like those made here would constitute refunds and therefore deductible expenses for purposes of the statute.

Congress plainly enacted § 1341 to afford certain taxpayers relief from "inequities" in prior law. Skelly Oil , 394 U.S. at 682. Just as clearly, the statute specifically anticipates that this relief will be afforded, in at least some cases, to "refunds or repayments with respect to rates made by a regulated public utility . . . if such refunds or repayments are required to be made by the Government, political subdivision, agency, or instrumentality." 26 U.S.C. § 1341(b)(2). In so providing, it seems to us that Congress must have anticipated the situation presented here. When regulatory authorities order a utility to make a one-time refund to its customers, as FERC and NCUC did here, when the utility makes the government-mandated, one-time refund, as DRI did here, and when the utility, where feasible, allocates the refunds to actual customers who had made the overpayments but fails to make a perfect match only because it was "not possible" to do so, as the district court found here, we think it clear that Congress intended to extend § 1341 relief to the utility. On the IRS's reading, the relief afforded by § 1341 would be illusory in the utility context--a regulated public utility, ordered to make a one-time refund of overcharges that had occurred over many years, could never avail itself of § 1341.

D.

In sum, DRI's 1991 refund to its customers qualified for relief under § 1341.

II.

DRI's remaining refund claim requires a determination of whether certain environmental cleanup costs it incurred constituted costs of incidental repairs deductible as ordinary and necessary business expenses under 26 U.S.C. § 162, or permanent improvements to prop-

16

erty that must be capitalized under 26 U.S.C. § 263 (1994 & Supp. IV 1998).

A.

Again, we set forth only the facts necessary to understand the legal issues. DRI, through a subsidiary, Dominion Lands, Inc. (DLI), owns certain property on 12th Street in Richmond, Virginia. This property contains a former power plant, built in 1901 and decommissioned in 1973. In 1986 and 1987, the property was transferred from one DRI subsidiary, Virginia Power, to another, DLI, which had been formed to engage in real estate sales and development. DLI paid $870,167 for the property. Between 1987 and 1991, DLI listed the property for six months with a real estate broker, nearly donated the property to the non-profit Richmond Renaissance, Inc., and conducted unsuccessful negotiations with a potential lessee of the property, who anticipated converting a portion of the property to office space. In 1991, DRI spent $2,242,232 on an environmental cleanup of the 12th Street property. This cleanup involved the removal of asbestos-containing materials, sludge, and assorted contaminants known and unknown.[5]

DRI maintains that it conducted the cleanup "in order to avoid the hazards and liability to trespassers or to third-parties down river if the property flooded." Brief of the Appellee/Cross-Appellant at 44. The company claims that it is entitled to deduct the cleanup costs as an ordinary and necessary business expense. The IRS contends that DRI incurred these expenses primarily to adapt the property for use in DLI's real estate development business, "a use that was new and different from the previous use of the property as an electric generating facility." Reply Brief at 33. As a result, the IRS maintains, DRI cannot deduct these costs and must instead capitalize them. The district court agreed with the IRS, finding that the environmental cleanup expenses were incurred to "put" the property into a new condition rather than to "keep" the property in its ordinary efficient condition. 48 F. Supp. 2d at 554 (relying on the "put versus keep" test articulated

_____

[5] We assume without deciding that DLI would be entitled under these circumstances to the same tax treatment as Virginia Power or DRI, even though the asbestos and other contaminants were not placed on the property in the course of DLI's real estate business.

17

in <u>Estate of Walling v. Commissioner</u>, 373 F.2d 190, 192-93 (3d Cir. 1967)).

B.

The distinction between capital expenditures and ordinary and necessary business expenses evades easy description. See, e.g., <u>Jones v. Commissioner</u>, 242 F.2d 616, 620 (5th Cir. 1957) ("There is not and probably cannot be any exact definition of the term `ordinary and necessary' and each case must be determined on the basis of its own facts and circumstances."). The application of the distinction is further complicated by the fact that certain individual expenditures would properly be treated as deductible if made in isolation but must be capitalized if incurred as part of a larger project of property improvement. <u>See id.</u> at 619. However, because the Internal Revenue Code specifically enumerates allowable deductions while providing only a more general framework for determining what should be capitalized, "deductions are strictly construed and allowed only `as there is a clear provision therefor.'" <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992) (quoting <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934)).

DRI seeks to deduct the cleanup cost as an "ordinary and necessary business expense[ ]" under 26 U.S.C. § 162. The implementing regulations for this provision permit a deduction for"[t]he cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition." 26 C.F.R. § 1.162-4 (1999). The IRS, meanwhile, contends that the applicable provision is 26 U.S.C. § 263, under which a taxpayer must capitalize the cost of"permanent improvements or betterments made to increase the value of any property."

Courts have articulated the distinctions between a deductible incidental repair and a non-deductible permanent improvement in a number of ways. In <u>Plainfield-Union Water Co. v. Commissioner</u>, the tax court explained that "[a]n expenditure which returns property to the state it was in before the situation prompting the expenditure arose, and which does not make the relevant property more valuable, more useful, or longer-lived, is usually deemed a deductible repair. A capi-

18

tal expenditure is generally considered to be a more permanent incre-
ment in the longevity, utility, or worth of the property." 39 T.C. 333,
337 (1962). In Estate of Walling, the Third Circuit explained that
"[t]he test which normally is to be applied is that if the improvements
were made to `put' the particular capital asset in efficient operating
condition, then they are capital in nature. If, however, they were made
merely to `keep' the asset in efficient operating condition, then they
are repairs and are deductible." 373 F.2d at 192-93.

DRI misses this essential point. The company repeatedly stresses
that in its view an expenditure cannot be treated as a capital improve-
ment unless it adds value to the property over and above the value of
the improvement itself, and that expenditures adding no value above
the amount of the expenditures themselves must be treated as repairs.
DRI claims that because its removal of asbestos assertedly did not
increase the value of the 12th Street property other than to free it from
contamination, the cost of the removal is a deductible repair. DRI fur-
ther contends that because its only use of the property was to sell it,
and because, both before and after the cleanup, it could sell the prop-
erty "as is," the cleanup was not a capital improvement. These argu-
ments reveal DRI's misunderstanding of the inquiry by placing the
focus on how much value an improvement adds to property, rather
than on the nature of the improvement itself. If DRI had built a park-
ing lot on the 12th Street property, for example, it would not be per-
mitted to deduct the cost of the parking lot if it elected to leave the
parking lot empty, or if no value was added to the property over and
above the cost of building the parking lot, or if it could sell the prop-
erty "as is" both before and after the improvement.

To distinguish between improvements that constitute deductible
repairs and those that must be capitalized, the focus must be not on
the amount of value added to the property by the improvements, but
on the nature of the improvement. If the improvement permits the
property to be utilized in a different way, the improvement is most
appropriately considered a capital expenditure. If the improvement
only restores value to the property that existed prior to deterioration
or to a discrete event that damaged the property, the improvement
may be properly treated as a deductible repair expense.

Here, DRI identifies no deterioration or discrete event that necessi-
tated the repair. Cf. In re Illinois Merchants Trust Co., 4 B.T.A. 103,

19

106-07 (1926) (permitting deduction for cost of replacing rotten warehouse foundation piles and a subsident wall when the rotting of the piles and the settling of the wall occurred as a result of a discrete event, the unexpected lowering of the water level of the Chicago River). In fact, at least some of the asbestos-containing materials removed from the power plant were used in the original construction of the power plant on the property.

The case at hand is like Jones, 242 F.2d at 616, and Jones v. United States, 279 F. Supp. 772 (D. Del. 1968). In the former, a regulatory authority had found the property in question to be unfit for human habitation, and the taxpayer's extensive improvements had to be capitalized because they put the building "into such condition as would permit it again to be used and be productive of income." 242 F.2d at 617-18. Similarly, in the latter case, the taxpayer had to capitalize extensive repairs made to an old 30-room mansion that were necessary to put the mansion on the market for sale. See 279 F. Supp. at 776. In both cases, the total cost of the improvements enabled the taxpayer to do something new with the property.

Here, the cost of the environmental cleanup, $2.2 million, may have dwarfed the value of the property itself prior to the cleanup-- DLI paid $870,167 for it, and the average appraised value was less than $1.6 million. This disparity belies the contention that the cleanup was a mere "incidental repair[ ]" that"neither materially add[ed] to the value of the property nor appreciably prolong[ed] its life, but k[ept] it in an ordinarily efficient operating condition." 26 C.F.R. § 1.162-4. In fact, the cleanup did even more than create the possibility of a new use for the property; it lifted the property out of what was essentially a condition of uselessness. DRI's contention--that the property could be sold "as is" both before and after the improvements --would permit the taxpayer to deduct the cost of any improvement.

Because the environmental cleanup substantially altered the character of the 12th Street property, enabling DRI to"put" the property to a wide range of new uses, Estate of Walling , 373 F.2d at 192, the cleanup costs permanently improved the property and so, as the district court found, must be capitalized.

20

III.

For the reasons set forth within, the judgment of the district court is in all respects

AFFIRMED.

21