

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-28-2007

# Alcoa Inc v. USA

Precedential or Non-Precedential: Precedential

Docket No. 06-1635

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

## Recommended Citation

"Alcoa Inc v. USA" (2007). *2007 Decisions.* Paper 151.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/151

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 06-1635

———————

ALCOA, INC.
and affiliated corporations
f/k/a ALUMINUM COMPANY OF AMERICA

v.

UNITED STATES OF AMERICA

Alcoa Inc.,

Appellant

———————

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D. C. No. 03-cv-00626)
District Judge:  Hon. Terrence F. McVerry

———————

Argued on May 15, 2007

Before:  FISHER, NYGAARD and ROTH, <u>Circuit Judges</u>

(Opinion filed: November 28, 2007)

Natalie H. Keller, Esquire **(ARGUED)**
Kirkland & Ellis
200 East Randolph Drive
Suite 6500
Chicago, IL 60601

   Counsel for Appellant Alcoa, Inc. and affiliated
   corporations, formerly known as, Aluminum
   Company of America


Deborah K. Snyder, Esquire **(ARGUED)**
Richard Farber, Esquire
United States Department of Justice
Mary Beth Buchanan, Esquire
United States Attorney
Eileen J. O'Connor, Esquire
Assistant Attorney General
Tax Division
P. O. Box 502
Washington, DC  20044

   Counsel for Appellee United States of America

2

B. John Williams, Jr., Esquire
Skadden, Arps, Slate, Meagher & Flom
1440 New York Avenue, NW
Washington, DC 20005

Counsel for Amicus-Appellant Curiae Entergy
Corporation

———————

**O P I N I O N**

———————

**ROTH**, <u>Circuit Judge</u>:

The issue before us is whether a taxpayer's expenses for environmental clean-up of its industrial sites, mandated by changes in environmental law, qualify for the beneficial tax treatment afforded by section 1341 of the Internal Revenue Code, 26 U.S.C. § 1341. Section 1341 applies when a taxpayer must restore a substantial amount of money, which the taxpayer had received in a prior tax year under a claim of right. Section 1341 allows the taxpayer to take a deduction in the current tax year for the amount of taxes the taxpayer would have saved if the amount restored had not been included in its reported gross income in the prior tax year.

We hold that Alcoa's environmental clean-up expenses, incurred in the 1993 tax year for pollution created in past years, do not qualify as restored moneys under Section 1341.

3

## I. **Factual and Procedural Background**

The facts of this case are simple and mostly undisputed. Alcoa is a well-known producer of aluminum and aluminum products. From 1940 to 1987, Alcoa's operations produced waste byproducts, which Alcoa disposed of during the ordinary course of business. Alcoa claims that it included disposal costs for these waste byproducts in its Cost of Goods Sold (COGS) calculations for the relevant years, thereby excluding them from its reported income during those years.[1]

After the enactment of new environmental laws, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), state and federal agencies found that a number of Alcoa's industrial sites were polluted and ordered Alcoa to conduct environmental clean-up at these sites. As a result, in 1993 Alcoa expended substantial funds on environmental remediation.

In its 1993 tax return, Alcoa claimed these costs as a tax

---

[1] Expenses included in COGS are excluded from gross income because "in a manufacturing, merchandising, or mining business, 'gross income' means the total sales, less the costs of goods sold." 26 C.F.R. § 1.61-3(a).

The government disputes that Alcoa included its waste disposal costs in the COGS calculation; since we are reviewing a grant of summary judgment for the government, however, we must credit Alcoa's version.

deduction; the Internal Revenue Service (IRS) did not challenge that treatment. Subsequently, however, Alcoa filed with the IRS a claim for a refund of over twelve million dollars. Alcoa maintained that under section 1341, Alcoa was entitled to enjoy not the tax benefit yielded by the 1993 deduction, but rather the much larger benefit (due to the then generally higher corporate tax rates) of a reduction of its 1940-1987 tax liability. The IRS disallowed the refund and Alcoa filed this action in the District Court.

After discovery the parties filed cross-motions for summary judgment. The District Court noted that a practically identical case had recently been decided in the United States District Court for the Eastern District of Virginia against the Reynolds Metal Company. *See Reynolds v. United States*, 389 F. Supp. 2d 692 (E.D. Va. 2005). Finding itself in full agreement with the opinion of the Virginia court, the District Court adopted that opinion as its own and granted summary judgment in favor of the government.

This timely appeal followed.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1346(a)(1), which provides that district courts have original jurisdiction of civil actions against the United States for the recovery of any tax alleged to have been erroneously or illegally assessed or collected. We have jurisdiction of this appeal under 28 U.S.C. § 1291.

We review the District Court's grant of summary judgment *de novo*, applying the same standard the District Court applied. *Doe v. County of Centre, Pa.*, 242 F.3d 437, 447 (3d Cir. 2001). Summary judgment is appropriate where there is no genuine issue of material fact to be resolved and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. Discussion

The issue in this case is whether Alcoa's 1993 expenditure for environmental remediation qualifies for the beneficial tax treatment allowed by section 1341. If it does not qualify, as the government argues, Alcoa can reduce its tax liability for the year 1993 only to the extent it deducts its remedial expenses from its 1993 income which will be taxed at the 1993 corporate tax rate of 35%. If Alcoa's 1993 environmental expenses do qualify under section 1341, however, Alcoa is entitled to a deduction in 1993 equal to what it would have saved in taxes in the years 1940-1987 by excluding the remediation expenses from its reported income for those prior tax years.[2] This treatment would be beneficial to

---

[2] Alcoa calculates the additional tax savings arising from section 1341 treatment at over twelve million dollars. It appears that it does so by apportioning its 1993 expenses among the years 1940 to 1987. There is a significant question, however, about whether the clean-up expenses in 1993 are in any meaningful sense the "same" costs Alcoa would have incurred in 1940-1987 if the remediation had been done over those years. It would be very difficult to establish what portion of the

6

Alcoa because corporate tax rates were generally far higher in 1940-1987 than in 1993. For the reasons we set out below, we conclude that the environmental remediation expenses that Alcoa incurred in 1993 do not qualify for beneficial tax treatment under section 1341. Alcoa's proposed interpretation of the statute, while artful, is not convincing.

## A. The Claim of Right Doctrine and Section 1341

The United States Tax Code operates on an annual accounting system, under which "each year's tax must be definitively calculable at the end of the tax year." *United States v. Skelly Oil Co.*, 394 U.S. 678, 684 (1969). Under the so-called "claim of right" doctrine, "[i]f a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." *Id.* at 680 (internal quotation omitted). Thus, a taxpayer must include in his tax return even those items of income which are subject to competing claims, so

---

pollution that was eventually removed should be apportioned to each of the 47 years in question; and even if that were possible, it would then be necessary to calculate what it would have cost to remove the relevant pollutants under the economic and technological circumstances of each of those years. This is a highly speculative enterprise. For purposes of this discussion, however, we assume that Alcoa would be able to identify the exact amount it would have been able to exclude from income in each of the 47 years under review.

7

long as he has full control of those moneys at the end of the tax year.

For many years, if a taxpayer filed a tax return but later was forced to relinquish some of the reported income, the taxpayer "would be entitled to a deduction in the year of repayment; the taxes due for the year of receipt would not be affected." *Skelly Oil*, 394 U.S. at 680-81. This system had the potential to create inequities because a taxpayer might be forced to pay taxes on the item of income at a certain tax rate and take a deduction at a lower rate (because of an intervening change either in the taxpayer's tax bracket or in the tax rates themselves). *Id.* at 681. The case which focused attention on these inequities is *United States v. Lewis*, 340 U.S. 590 (1951). In 1944, the taxpayer in *Lewis* had received a bonus from his employer, on which he had properly paid income taxes in the year of receipt. Two years later, in 1946, a state court ordered Lewis to repay his employer part of that bonus because it had been improperly computed. "Until payment of the judgment in 1946, [Lewis] had at all times claimed and used the full [bonus amount] unconditionally as his own, in the good faith though 'mistaken' belief that he was entitled to the whole bonus." *Id.* at 591. The government argued that Lewis should deduct the amount he returned to his employer as a loss from his 1946 tax return; Lewis wished to recompute his tax for 1944. The Court sided with the government and held that under the well-established claim of right doctrine, the tax year in which the contested amount was received could not be reopened, whether

this would "result[] in an advantage or disadvantage to a taxpayer." *Id.* at 592.

8

In order to correct the inequities made apparent by the *Lewis* decision, Congress enacted section 1341, which, "as an alternative to the deduction in the year of repayment which prior law allowed, . . . permits certain taxpayers to recompute their taxes for the year of receipt." *Skelly Oil*, 394 U.S. at 682. Section 1341 is designed to put the taxpayer in essentially the same position he would have been in had he never received the returned income in the first place. *Dominion Res., Inc. v. United States*, 219 F.3d 359, 363 (4th Cir. 2000). Under the title "Computation of tax where taxpayer restores substantial amount held under claim of right," section 1341 provides in relevant part:

(a) General rule. If –

(1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;

(2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

(3) the amount of such deduction exceeds $3,000, then the tax imposed by this chapter for the taxable years shall be the lesser of the following:

9

(4) the tax for the taxable year computed with such deduction; or

(5) an amount equal to

   (A) the tax for the taxable year computed without such deduction, minus

   (B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

26 U.S.C. § 1341(a). The "net effect" of the provision is "that the taxpayer can recompute his taxes for the year in which he originally received the money, excluding from his income that amount which he later repaid." *Reynolds*, 389 F. Supp.2d at 698. By allowing the taxpayer the choice between a simple deduction and a recalculation of the prior year's tax liability, section 1341 ensures that any change in tax rates or in the taxpayer's tax bracket is a tax neutral event with respect to the disputed item of income.

For a taxpayer to qualify for the beneficial tax treatment of section 1341, (1) the taxpayer must have appeared to have an unrestricted right to an item included in gross income for a prior taxable year (*i.e.*, must have included the item in income under a claim of right); (2) it must be established after the close of that

10

prior year that the taxpayer did not have an unrestricted right to the item; (3) the taxpayer must be entitled to deduct the amount of the item in the year in which the taxpayer restored the item; and (4) the amount of the deduction must exceed $3,000. *Dominion Res.,* 219 F.3d at 363.[3] The taxpayer bears the burden of proving his eligibility for section 1341 treatment. *Kappel v. United States*, 437 F.2d 1222, 1227 (3d Cir. 1971).

In the District Court, the government conceded (as it does here) that Alcoa has met the third and fourth requirements of section 1341 because it was entitled to a deduction in 1993 that exceeded $3,000.[4] The government contended, however, that Alcoa could not satisfy the first or second requirement for eligibility under the provision, *i.e.*, (1) inclusion of an item in gross income under claim of right, and (2) later determination that the taxpayer did not have an unrestricted right to that item (restoration of that item). The government argued that Alcoa could not characterize as an "item . . . included in gross income"

---

[3] In addition to this "general rule," section 1341 includes certain exceptions, one of which – the "inventory exception" – is the object of a secondary dispute in this case. *See* 26 U.S.C. § 1341(b)(2). Because we do not reach the parties' disagreement as to the interpretation of this exception we do not discuss it here.

[4] Section 1341 does not itself create the right to a deduction in the year of the repayment. Rather, it is a prerequisite for section 1341 treatment that the taxpayer be entitled to a deduction for all or part of the repaid amount under some other Code section. *Skelly Oil*, 394 U.S. at 683.

the funds it did not spend in 1940-1987 on additional waste disposal activities. The government's position was that "gross income" means "gross receipts"; "gross income" does not include money the taxpayer failed to spend. Alcoa disagreed, reasoning its "gross income" for the years in question was overstated because Alcoa's cost of goods sold was understated.

The government's response to this argument was that, even if the amounts not spent by Alcoa could qualify as an "item included in gross income," the claim of right doctrine applied only when the taxpayer was subject to an adverse claim at the time it included the item in gross income – whether or not the taxpayer was aware of the adverse claim at the time of the initial return. In the government's view, section 1341 does not apply where the taxpayer had an *actual* and not simply an *apparent* right to the item, but later lost its right to the item through an intervening change in factual circumstances. Under this theory, even if Alcoa's insufficient waste disposal expenses could qualify as an "item included in gross income," Alcoa had an *actual* – not an *apparent* – claim to the funds it saved by failing to conduct proper waste disposal. This is so because there was no rival claim to those funds. Alcoa replied that something can be *apparent* and also be *true*; in Alcoa's view, all a taxpayer must show to qualify under section 1341 is that the taxpayer lost

the right to the item at some point before claiming the

12

deduction.[5]

The District Court, pursuant to the *Reynolds* decision, grudgingly accepted Alcoa's argument that its insufficient environmental expenditures during the 1940-1987 period amounted to the inclusion of an item in gross income under an apparent claim of right. *See Reynolds*, 389 F. Supp. 2d at 702 (noting that the taxpayer had "skillfully co-opted the definition of gross income for its own means"). As for the requirement of a determination in a later year that the taxpayer did not have a claim of right to that item, however, the District Court held that Alcoa could not satisfy it and therefore could not avail itself of the beneficial treatment of section 1341.[6]

---

[5] The question of whether an *actual* claim of right can qualify as an *apparent* one under the statute has caused some disagreement in the federal courts. *Compare Dominion Res.*, 219 F.3d 359 (holding that a taxpayer may qualify for section 1341 treatment even if, during the year of receipt, he did in fact have an actual right to the item of income) *with Cinergy Corp. v. United States*, 55 Fed. Cl. 489 (Fed. Cl. 2003) (holding that section 1341 treatment presupposes that the taxpayer's right to was "apparent," not "actual," in the year of receipt).

[6] Because of the conclusion we come to in this appeal, we do not need to reach the question of whether the funds Alcoa did not spend in 1940-1987 on waste disposal qualify as "items included in gross income." We note, however, that the argument presents significant difficulties. As a practical matter, the relationship between Alcoa's expenditure in 1993, on the one hand, and whatever unspent moneys may have been

## B. The "Same Circumstances, Terms and Conditions" Test

We agree with the District Court that Alcoa's clean-up expenditures in 1993 do not qualify as the restoration of income to which Alcoa found it did not have a claim of right. How then can a taxpayer satisfy section 1341's requirement that it "was established after the close of [a] prior taxable year (or years) that the taxpayer did not have an unrestricted right" to an item of income or a portion of such item? 26 U.S.C. § 1341(a)(2). The District Court, adopting *Reynolds*, held that a taxpayer's later arising obligation to remedy environmental ills is not a determination that the taxpayer did not have an unrestricted right to an item of income or to a portion of such item, as required by the statute, because the taxpayer had not demonstrated restoration of an item of income to an entity from whom the income was received or to whom the item of income should have been paid. *Reynolds*, 389 F. Supp. 2d at 702; *see also*

included in the COGS for the years under review, on the other, is tenuous and speculative at best. The exact amount Alcoa expended on clean-up in 1993 cannot be simply apportioned among the 47 years at issue without regard to the difference in the kind of activity (immediate waste disposal vs. delayed clean-up), cost of labor, cost and availability of technology, etc. Moreover, it seems unlikely that the statute was intended to cover unspent money. What Congress had in mind was the situation where a taxpayer received income that it later had to relinquish. Alcoa's artful argument that waste disposal expenses would have been part of COGS, and thus an item of income, exploits technicalities at the expense of common sense.

14

*Kappel*, 437 F.2d at 1226 ("[t]he requirement that a legal obligation exist to restore funds before a deduction is allowable under the claim of right doctrine is derived from the language of § 1341(a)(2) of the Code").

On appeal, Alcoa argues that, in order to take advantage of section 1341, it needs to show only that it discovered it could not keep the money it had not spent on more effective clean-up in 1940-1987 because after the enactment of CERCLA and other environmental laws it was forced to spend the money on remediation efforts. The government responds that this interpretation would extend the benefits of section 1341 far beyond its intended scope and that a taxpayer must show it has "restored" the amount at issue to another claimant with actual right to it. The government urges that a taxpayer is entitled to section 1341 treatment if the repayment arose from the "same circumstances, terms and conditions" as the original payment of the item to the taxpayer. *See, e.g., Kraft v. United States,* 991 F.2d 292, 295 (6th Cir. 1993); *Dominion Res.,* 219 F.3d at 367; *Cinergy Corp. v. United States*, 55 Fed. Cl. 489, 507 (Fed. Cl. 2003); *Blanton v. Comm'r*, 46 T.C. 527, 550 (T.C. 1966). In other words, there must be a "substantive nexus between the right to the income at the time of receipt and the subsequent circumstances necessitating a refund." *Dominion Res., Inc. v. United States*, 48 F. Supp. 2d 527, 540 (E.D. Va. 1999), *aff'd*, *Dominion Res*., 219 F.3d 359.

Alcoa's claim fails under this "same circumstances, terms, and conditions" test. Even if we were to credit Alcoa's theory about its new obligation to engage in clean-up in 1993 –

15

namely, that it is equivalent to the discovery that it did not have a claim of right on the money it saved by not engaging in more extensive environmental efforts in 1940-1987 – it is clear that the new obligations did not arise from the same *circumstances*, *terms*, and *conditions* as the initial failure to spend additional funds on environmental clean-up.  Rather, the obligations were created by *new* circumstances, terms, and conditions, namely, by an intervening change in environmental legislation.  There is no substantive nexus that can be recognized for our purposes between the waste disposal expenses Alcoa did not incur in 1940 to 1987 and its clean-up expenses in 1993.

Taxpayers' claims have been rejected in analogous situations.  For instance, in *Cinergy*, the Court of Federal Claims held that a utility company's "refund" to current customers of payments for deferred taxes made by former customers arose from "subsequent and unrelated events."  55 Fed. Cl. at 508.  The "refund" did not arise from a recognition that the "amounts originally collected were excessive or otherwise unneeded"; rather, customers began protesting the utility's rates and, faced with an investigation into the rates' reasonableness, the utility proposed a reduction but paired it with a plan for "accelerated reversal of certain tax reserves" so as to reduce the effect of the impending rate reduction on its equity.  *Id.*  The court found that the obligation to reverse the tax reserves did not arise from the same circumstances, terms, and conditions as the original accumulation of the reserves, but from the later dispute with customers and wrote that "nothing in the case law suggests that the requisite nexus is satisfied simply because the receipt of income and its later return both derived from the same regulatory process." *Id.*  Here, the obligation to clean up certain

16

sites – though undoubtedly connected in some way to the earlier polluting activities – did not arise from some inherent fault in Alcoa's waste management choices. The moneys not spent did not fall under the pall of a latent competing claim. Instead, the need to expend money for remediation arose from the more stringent regulations that were *later* enacted.

We conclude then, as the government proposes, that because Alcoa's expenditure of funds in 1993 was not the restoration of particular moneys to the rightful owner and did not arise from the same circumstances, terms, and conditions as Alcoa's original acquisition of the income, Alcoa's 1993 clean-up expenditures do not qualify for the beneficial tax treatment provided under section 1341. *See id*.

This conclusion appears to be consistent with the language of the statute – although the language of section 1341 is ambiguous in that it does not explain "how a taxpayer or the IRS is supposed to establish that the taxpayer does not have an unrestricted right to income." *Chernin v. United States*, 149 F.3d 805, 815 (8th Cir. 1998). To resolve this ambiguity in the language of the statute, we will turn to the congressional intent revealed in the history and purpose of the statutory scheme. *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 642 (1990). The historical background of the statute, recounted in some detail above, strongly suggests that Congress intended to allow taxpayers to reverse their tax liability for funds received and included in the relevant tax return although they were the object of a competing claim. As the Court of Federal Claims found, at the time the statute was enacted, claim of right cases "tend[ed] to coalesce around some dispute over the ownership of income

17

or a mistake of fact, deriving, for example, from a quarrel over the ownership of income producing property, the misapplication of a contract provision, or the payment of funds under a contingency based upon business expectations that were thought to, but actually did not, materialize." *Cinergy*, 55 Fed. Cl. at 500 (citations omitted). The purpose of section 1341 was, quite simply, to ensure that, when the taxpayer found itself to be the losing party in the dispute and had to turn over specific funds to the rightful owner, the taxpayer should be able to recompute its income for the year of receipt so as to entirely reverse the tax liability due to the disputed item.

Legislative history confirms this interpretation. It documents the section's enactment in reaction to the perceived inequity of *Lewis*, *supra*, and makes repeated references to repayment, restoration, and restitution. *See, e.g.*, H.R.Rep. No. 83-1337, at 86-87, *reprinted in* 1954 U.S.C.C.A.N. 4017, 4113 ("The committee's bill provides that if the amount *restored* exceeds $3,000, the taxpayer may recompute the tax for the prior year, excluding from income the amount repaid" ; "excluding the amount *repaid* from the earlier year's income is likely to have little, if any, tax advantage over taking a deduction in the year of restitution") (emphasis added); S.Rep. No. 83-1622, at 188, *reprinted in* 1954 U.S.C.C.A.N. 4621, 4751 (same).

> Similarly, the accompanying regulations explain that [i]f, during the taxable year, the taxpayer is entitled under other provisions of chapter 1 of the Internal Revenue Code of 1954 to a deduction of more than $3,000 because of the *restoration to another* of an item which

was included in the taxpayer's gross income for a prior taxable year (or years) under a claim of right, the tax imposed by chapter 1 of the Internal Revenue Code of 1954 for the taxable year shall be the tax provided in paragraph (b) of this section.

26 C.F.R. § 1.1341-1(a)(1) (emphasis added).[7] Clearly in order to qualify under the section, the taxpayer must show not simply that it is no longer entitled to keep money it has included in an earlier return, but also that it has "restored" it.

Alcoa argues, however, that, even if section 1341 includes a restoration requirement, it does not mean that restoration must be to the taxpayer's customers or to a connected third party. Rather, all the regulations require is restoration "to another," and therefore any "other" to whom moneys are paid will do.

We reject this argument. The requirement that there be a nexus is inherent in the concept of "restoration" itself. It is true, as Alcoa points out, that "restoration to another" is not

---

[7] We also note, of course, that the title of section 1341, "Computation of tax where taxpayer restores substantial amount held under claim of right," uses the verb "restore." We do not rely on this, however; although generally "the title of a statute or section can aid in resolving an ambiguity in the legislative text," *INS v. Nat'l Ctr. for Immigrants' Rights*, 502 U.S. 183, 189 (1991), the Internal Revenue Code's rules of construction provide that no "legal effect" should be given to descriptive matter in the Code. 26 U.S.C. § 7806(b).

further defined in the statute or the regulations; the latter merely state, somewhat tautologically, that "restoration to another means a restoration resulting because it was established after the close of [the] prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item (or portion thereof)." 26 C.F.R. § 1.1341-1(a)(2). For clarification then we will turn to the dictionary. *See Perrin v. United States*, 444 U.S. 37, 42 (1979) (it is a fundamental canon of statutory construction that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning").

Webster's Third International Dictionary defines "restore" as: "1: to give back (as something lost or taken away); make restitution of; return. . . . 2: to put or bring back; 3: to bring back to or put back into a former or original state." *Webster's Third International Dictionary Unabridged* 1936 (1971). The American Heritage Dictionary lists "4. To make restitution of; give back; [*e.g.*,] *restore the stolen funds.*" *The American Heritage Dictionary of the English Language* 1538 (3d ed. 1992). Clearly, to restore something to another means to give it to the person who either once had it or should have had it all along – in this case, the person with the actual claim of right to the item of income.

Alcoa's argument that the legislative history shows that Congress intended to extend section 1341 benefits to completely unconnected third parties is unavailing. Alcoa grounds its contention on the statement found in both the Senate and House reports that section 1341 would apply to cases of transferee liability such as *Arrowsmith v. Comm'r*, 344 U.S. 6 (1952). In *Arrowsmith*, a corporation was liquidated, but subsequent to the

20

liquidation a judgment was rendered against it. As a result, the shareholders who had received capital gain income from the liquidation of the corporation were required to disgorge part of that income to satisfy a claim by the corporation's creditor. Somewhat puzzlingly, Alcoa presents this as evidence that Congress intended payments *to anyone* to count. But the references to *Arrowsmith* in the legislative history intimate precisely the opposite. In *Arrowsmith*, the funds received by the shareholders at the time of their corporation's liquidation were partly the object of a competing claim; when that competing claim was perfected, the shareholders were obligated to turn over the funds. There is nothing remarkable about the recognition that section 1341 applies to such an instance – and nothing at all that could be construed as analogous to Alcoa's situation here.

Moreover, for substantially the same reasons given by the District Court in *Reynolds* (and adopted by the District Court here), we decline Alcoa's invitation to follow the Court of Federal Claims' decision in *Pennzoil-Quaker State Co. v. United States*, 62 Fed. Cl. 689 (Fed. Cl. 2004). *See Reynolds*, 389 F. Supp. 2d at 700-702. In *Pennzoil*, the taxpayer, Quaker State, had purchased crude oil from independent oil producers for a period of time. In 1994, a number of these independent producers brought an antitrust action against Quaker State, alleging that Quaker State had engaged in price-fixing of its own products, thereby reducing the price at which the producers could sell their oil to Quaker State. Eventually Quaker State settled the lawsuit for $4.4 million and claimed that the corresponding deduction on the year of the settlement was entitled to Section 1341 treatment. The Court of Federal Claims

agreed. *Pennzoil* is both unpersuasive and distinguishable. It is unpersuasive because the decision is based on a number of problematic assumptions, including that Quaker State's COGS during the years of the price-fixing would have been higher without its alleged misconduct and that there was an ascertainable relationship between the settlement amount and the amount by which Quaker State's COGS would have been higher. In addition, *Pennzoil* is distinguishable because even if the *Pennzoil* court's understanding of the facts was correct, there was an identifiable entity – the wholesale oil merchants – who would have received the money had Quaker State not saved it by illegally keeping the wholesale prices down. In Alcoa's case, there simply was never any entity that had a better right to the funds Alcoa deducted in 1993 than Alcoa itself.[8]

The other case Alcoa relies on, *Barrett v. Comm'r*, 96 T.C. 713 (1991), is no more persuasive. The taxpayers in that case had bought and sold stock options and realized a large short-term capital gain. The Securities & Exchange Commission charged Barrett with using inside information to buy the options and instituted proceedings to cancel his broker's license. Certain other brokers filed suit against Barrett and

---

[8]Evidently aware that this is a significant weakness in Alcoa's theory, *amicus* Entergy Corporation argues that the restoration requirement is satisfied because the aim of CERCLA was "to restore to the public the income attributable to the producers' environmental consumption." Like Alcoa's own proposed interpretation of the statute, the argument that the amount not spent by Alcoa in 1940-1987 was somehow restored to "the public" in 1993 is creative but not convincing.

others, seeking $10 million. The lawsuits were eventually settled, with Barrett paying about $54,000 to the plaintiffs. The Tax Court allowed Barrett to benefit from section 1341 treatment for the settlement amount. In doing so it treated the settlement as directly related to the profit, talking about "the $54,400 of the proceeds from the sale of the options." *Id.* at 718. After the Tax Court's decision, the I.R.S. declared its non-acquiescence with the decision. 1992-2 C.B. 1, 1992 WL 1483929 (I.R.S. A.C.Q. Dec. 31, 1992). The IRS noted that "[t]he Tax Court in the instant case failed to consider whether there was a nexus between the obligation to repay and the original option profits received by Barrett. Specifically, neither the plaintiffs' complaint nor any other evidence was introduced by either party to establish the grounds for the civil suit, the allegations made in the complaint or the focus of the plaintiffs' discovery." I.R.S. AOD 1992-08, 1992 WL 794825 (I.R.S. A.O.D. March 13, 1992). *Barrett*, like *Pennzoil*, appears to be based on the rationale that the settlement gave back certain funds to persons or entities that had a better right to them, but in each case the analysis was too imprecise to be followed.

In sum, only the most torturous reading of section 1341 could equate Alcoa's expenditures to clean up its sites with restoring moneys to the rightful owner. Under Alcoa's theory, a taxpayer may qualify under section 1341 almost any time that it is faced with an expense that can be related in any way to the fact that the taxpayer did not pay that expense in a prior year. This approach turns the annual accounting system into an

23

illusion.[9]

## IV. __Conclusion__

For the reasons stated above, we will affirm the District Court's grant of the government's motion for summary judgment motion and its denial of Alcoa's.

---

[9]Because we reach this result without relying on Revenue Ruling 2004-17, which the IRS issued while the *Reynolds* litigation was ongoing and which addresses the precise issue presented both in *Reynolds* and here, we do not decide what deference it should be accorded. *Compare Long Island Care at Home v.* Coke, 127 S.Ct. 2339, 2349 (2007) (holding that an "Advisory Memorandum" of the Department of Labor, issued only to Department personnel and written in response to the litigation, should be afforded deference because it reflected the Department's fair and considered views developed over many years and did not appear to be a "*post hoc* rationalization" of past agency action) *with AMP Inv. and Consol. Subsidiaries v. United States*, 85 F.3d 1333, 1338-39 (Fed. Cir. 1999) ("[a] revenue ruling issued at a time when the I.R.S. is preparing to litigate is often self-serving and not generally entitled to deference by the courts") *and Catskills Mtns. Chapter of Trout Unltd. v. City of New York*, 273 F.3d 481, 491 (2d Cir. 2001) ("a position adopted in the course of litigation lacks the indicia of expertise, regularity, rigorous consideration, and public scrutiny that justify *Chevron* deference.")