**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2161
_____

SHEILA A. KAZAR,
                        Appellant

v.

SLIPPERY ROCK UNIVERSITY OF PENNSYLVANIA,
SUSAN HANNAM, JACK LIVINGSTON,WILLIAM WILLIAMS
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 2-13-cv-00060)
District Judge: Hon. Alan N. Bloch
_____

Argued January 12, 2017
_____

Before: SMITH, <u>Chief Judge</u>, JORDAN and SHWARTZ, <u>Circuit Judges</u>.

(Filed: February 14, 2017)

_____

OPINION*
_____


James B. Lieber, Esq. [Argued]
Thomas M. Huber, Esq.
Jacob M. Simon, Esq.

---

* This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

Lieber Hammer Huber & Bennington
5528 Walnut Street
2nd Floor
Pittsburgh, PA 15232

Counsel for Appellant

Kemal A. Merichli, Esq. [Argued]
Scott A. Bradley, Esq.
Office of Attorney General of Pennsylvania
564 Forbes Avenue
6th Floor, Manor Complex
Pittsburgh, PA 15219

Counsel for Appellee

SHWARTZ, Circuit Judge.

Sheila Kazar, a former professor at Slippery Rock University ("SRU"), sued: (1) defendants Susan Hannam, Jack Livingston, and William Williams (the "Individual Defendants") under 42 U.S.C. § 1983 for retaliating against her in violation of the First Amendment for participating in a program that supports Lesbian, Gay, Bisexual, and Transgender ("LGBT") issues and denying her equal protection; and (2) SRU under Title IX, 20 U.S.C. § 1681, for engaging in gender-based employment discrimination. The District Court correctly granted the Individual Defendants' summary judgment motion on Kazar's § 1983 claims because the record: (1) shows that SRU did not renew her tenure-track teaching contract because she failed to timely obtain her Ph.D.; and (2) does not show that the Individual Defendants treated her differently than similarly situated persons. The District Court also correctly ruled in favor of SRU on Kazar's gender-based employment discrimination claim under Title IX. We will therefore affirm.

2

# I

In the Spring of 2009, SRU posted an opening for a full-time tenure-track Assistant Professor position in the Department of Geography, Geology, and the Environment ("Geography Department" or the "Department"). The posting indicated that the position required an applicant to have a Ph.D. at the time of appointment. Kazar, who at the time was pursuing a Ph.D. in geography at West Virginia University ("WVU"), applied for the position and interviewed with Susan Hannam, the Dean of the College of Health, Environment, and Science. Hannam told Kazar that she needed to complete her Ph.D. before commencing employment with SRU. Kazar informed Hannam that she would try to obtain her Ph.D. by the start of classes but did not guarantee that she would do so. On May 15, 2009, SRU offered Kazar the position in the Geography Department and informed her that the terminal degree for the position was a Ph.D. in geography, geology, environmental sciences, or a related field. Kazar accepted the offer and was appointed to the position. In her new position, Kazar, like all of SRU's probationary tenure-track faculty members, was subject to an annual review to determine whether her employment would be renewed for the following year.

On July 30, 2009, Kazar informed Hannam that she had scheduled her dissertation defense for October 21, 2009, and expressed confidence that the process would go smoothly. While Kazar did not earn her Ph.D. by the start of classes, SRU

3

did not revoke Kazar's employment offer, and instead relied on her representation that she would defend her dissertation that Fall.

On October 14, 2009, Kazar informed Hannam and William Williams, the Provost of SRU, that she needed to further delay her dissertation defense. She anticipated defending her dissertation in February 2010 and graduating from WVU with her Ph.D. in May 2010. As a result, Kazar's position was converted to a lesser paying non-tenure-track instructor position.

Kazar did not obtain her Ph.D during the 2009-10 academic year. The Department Evaluation Committee ("DEC") nevertheless recommended that Kazar's contract be renewed for the following academic year, provided that she complete her Ph.D. Hannam informed Kazar of this recommendation and that she would be required to successfully defend her dissertation by July 23, 2010. Kazar met this deadline by defending her dissertation on July 22, 2010, and, on August 16, 2010, SRU offered Kazar a tenure-track position for the 2010-11 academic year. The offer letter once again stated that a Ph.D. in geography, geology, environmental sciences, or a related field was the terminal degree for the position.

Before the start of the 2010-11 academic year, Kazar explained to Hannam that she still needed to edit her dissertation to complete her Ph.D. and graduate. In November 2010, an SRU administrator asked Kazar if she intended to graduate by December 2010. Kazar responded that she would not graduate in December but intended to do so by May 2011. Shortly thereafter, Hannam asked Kazar about her graduation date, and Kazar

4

responded that she needed time to complete edits to her dissertation.

Concerned about the status of her Ph.D. and its impact on her employment, Kazar contacted her doctoral chair, WVU Geography Professor Timothy Warner. On December 10, 2010, Warner sent an email to SRU stating:

> I understand from Sheila Kazar that you need feedback from me, as Chair of Sheila's dissertation committee on her likelihood of graduating in the spring. I can assure you that Sheila has defended her dissertation and is close to being done. She still has some corrections to make to her dissertation and these corrections need to be approved by her entire dissertation committee before she will actually graduate, but I'll do my best to work with her and her committee to see that she graduates in May.

App. 167.

In February 2011, Jack Livingston, the Chair of SRU's Geography Department, and Associate Professor Julie Snow, the head of the DEC, submitted letters to Hannam recommending that Kazar's employment not be renewed at the end of the academic year. The DEC recommendation, dated February 1, 2011, noted that Kazar had not completed her Ph.D., referred to deficiencies in her teaching and research, and stated that she failed to promote higher-level critical thinking in her courses. Livingston's recommendation, dated February 4, 2011, stated that he could not recommend renewal of her contract because of the continuing unfinished status of her doctoral degree and the lack of evidence of a firm completion date.

On February 10, 2011, Kazar submitted a rebuttal letter to Hannam, which argued that the DEC's assessment of her teaching abilities was erroneous and conveyed Kazar's expectation that she would graduate in May 2011. On the same day, her thesis advisor, Warner, wrote an email to Livingston, Hannam, and Williams addressing the concerns

5

Livingston and the DEC raised about Kazar's doctorate and providing details about seventeen items Kazar needed to complete on her dissertation. Among other things, he explained:

> Sheila defended her dissertation in July of last year. The committee was pleased with her work, but asked for some revisions that turned out to be relatively substantial once we got stuck into them. . . . I will ask the committee to give me a definitive decision on their acceptance of the dissertation by March 28. I am assuming the response of the committee will be positive, and therefore that Sheila will graduate May 15[,] 2011.

App. 174.

SRU did not renew Kazar's contract. Specifically, on February 25, 2011, Hannam recommended against renewing Kazar's contract for the next academic year due to Kazar's failure to receive her doctoral degree in a timely fashion and concerns about Kazar's teaching. On March 23, 2011, Williams recommended against Kazar's renewal for the 2011-12 academic year. By letter dated March 30, 2011, SRU President Robert Smith informed Kazar that SRU would not renew her contract.

On April 6, 2011, the SRU Geography Department posted an opening for a temporary instructor position and indicated that the position required a master's degree in geology or a related field and that a Ph.D. was preferred. Despite encouragement from Smith, Kazar did not apply for the position, which Kolson Schlosser, Ph.D., ultimately filled.

Kazar is a lesbian and while at SRU, participated in a number of LGBT programs, including Safe Zone, which provides support for LGBT students. She received Safe Zone training on October 12, 2010, and afterwards placed a pink triangle sticker on her

6

office door to signify that she had completed the training. The record does not contain any evidence that Kazar's colleagues or the Individual Defendants made any statements to her about her sexual orientation or participation in any of these programs.

Kazar filed this lawsuit, alleging denial of free speech (Count One) and equal protection (Count Two) under § 1983 against the Individual Defendants and gender-based employment discrimination in violation of Title IX against SRU (Count Three). Prior to filing this lawsuit, Kazar did not raise a claim of discrimination with anyone at SRU, file a discrimination complaint with SRU, or seek administrative relief through the Equal Employment Opportunity Commission or the Pennsylvania Human Rights Commission.

After extensive discovery, defendants filed a motion for summary judgment. The District Court granted the motion on Counts One and Two and dismissed Count Three. With respect to Counts One and Two, the Court found that there was no evidence that the non-renewal of Kazar's tenure-track contract was connected to her engaging in protected activity or her gender. As to Count Three, the Court held that Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, was the exclusive avenue to bring her employment discrimination claim, and since Kazar had not exhausted her remedies under Title VII, she could not now pursue claims under Title IX. Kazar appeals.

II[1]

A

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

7

We review the District Court's grant of summary judgment de novo.  Alcoa, Inc. v. United States, 509 F.3d 173, 175 (3d Cir. 2007).  In doing so, we will apply the same standard as the District Court and view facts and make reasonable inferences in Kazar's favor.  Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005).

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" only if there is sufficient evidence on which a reasonable jury could find for the non-movant.  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

B

To prevail on a First Amendment retaliation claim, a public employee, such as a professor at a public university,[2] must demonstrate that: (1) she engaged in activity that is protected by the First Amendment; and (2) the protected activity was a substantial factor in the employer's retaliatory action.[3]  Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009).  "The first factor is a question of law; the second factor is a question of fact."  Id.

---

[2] A professor at a public institution is a public employee.  Bd. of Regents of State Coll. v. Roth, 408 U.S. 564, 576-77 (1972) ("[I]n the area of public employment, the Court has held that a public college professor dismissed from an office held under tenure provisions and college professors and staff members dismissed during the terms of their contracts have interests in continued employment that are safeguarded by due process." (citations omitted)); see also Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009) (observing that a professor at Delaware State University was a public employee).

[3] We have set forth a different set of elements for a non-public employee to state a First Amendment retaliation claim: (1) that the employee engaged in a protected activity; (2) that the defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights; and (3) that there was a causal connection between the protected activity and the retaliatory action.  Thomas v. Independence Township, 463 F.3d 285, 296 (3d Cir. 2006).

(internal quotation marks and citation omitted). "If these two elements are satisfied, the burden shifts to the defendants to demonstrate that the same action would occur if the speech had not occurred." Id.

Here, Kazar claims that she engaged in a protected activity—participating in the Safe Zone program—and as a result, SRU retaliated against her by choosing not to renew her contract. Kazar and the Individual Defendants do not dispute that Kazar's posting of a pink triangle on her door and participating in the Safe Zone program constituted protected speech under the First Amendment. The Individual Defendants instead argue that this protected activity was not a "substantial factor" in SRU's decision not to renew Kazar's contract.

A plaintiff can establish that her participation in a protected activity was a "substantial factor" in an employer's retaliatory actions by showing: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997)). If the plaintiff cannot make either of these showings, then she must demonstrate that the evidence would provide the trier of fact a basis to infer causation. Id. Kazar has failed to establish, under any of these approaches, that her participation in the Safe Zone Program was a "substantial factor" in SRU's decision to not renew her contract.

First, the temporal proximity between Kazar's participation in the Safe Zone program and SRU's decision not to renew her contract is not unusually suggestive.

9

Kazar completed the Safe Zone training in mid-October 2010. In accordance with Kazar's union contract, she received annual reviews from her department and department chairperson in early February 2011, and the first recommendation against renewing her contract was not issued until after that review. Thus, more than three months passed between her Safe Zone training and the recommendation against renewing her contract. Courts have held that this timeframe is not unusually suggestive of retaliatory intent. Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (per curiam) (observing that three- and four- month periods between a protected activity and retaliatory conduct were not suggestive of retaliatory intent); see also Jones v. Se. Pa. Transp. Auth., 796 F.3d 323, 331 (3d Cir. 2015) (holding that a gap of "nearly three months" between an employee's protected activity and an employer's adverse employment action does not provide an inference of causation).

Second, Kazar has failed to establish a pattern of antagonism based on her involvement in LGBT advocacy groups. The record does not contain any evidence indicating that the Individual Defendants made any negative statements to Kazar about her participation in any of these programs. Furthermore, the record does not show that the Individual Defendants changed the way they interacted with Kazar because of her participation in these school-sponsored programs. It does not even show that they had anything more than a passing awareness that Kazar was affiliated with the Safe Zone program. Kazar has simply failed to set forth any evidence of antagonism by the Individual Defendants.

10

Finally, the record does not provide a basis from which a reasonable juror could conclude that SRU failed to renew Kazar's contract due to her participation in the Safe Zone program. Instead, the record supports a finding that SRU failed to renew Kazar's contract because she had not timely completed her Ph.D. The Ph.D. requirement was well-known and existed even before Kazar applied for the job and concerns about the status of her Ph.D. were expressed both before and after her participation in Safe Zone. She represented that she would do her best to complete her Ph.D. before classes began in the fall of 2009, but failed to do so. Instead, she said that she had scheduled her dissertation defense for October 21, 2009. When October approached, Kazar informed SRU that she would not defend her dissertation by this new date but expected to do so in February 2010. She again failed to meet the projected timeline for completing her Ph.D., but SRU nevertheless allowed her to return for the 2010-11 academic year because she defended her dissertation in July 2010. When it came time for Kazar's 2010-11 academic year evaluation in February 2011, she still had not completed her Ph.D. and, according to her dissertation advisor, was in the midst of completing "substantial" revisions. As a result of her failure to timely receive her doctorate, SRU did not renew Kazar's contract for the 2011-12 academic year. SRU nonetheless encouraged her to apply for a temporary instructor position in the Geography Department—an opportunity that Kazar declined to pursue.

Given the absence of any evidence showing the Individual Defendants acted with retaliatory animus towards Kazar because of her participation in the Safe Zone program, and in light of this sequence of events, the only reasonable inference a jury could draw is

11

that she was not allowed to continue in her tenure-track faculty position because she failed to complete her Ph.D. Accordingly, the District Court's entry of summary judgment on Count One will be affirmed.

C

Kazar's equal protection claim also fails. To prevail on a § 1983 claim for denial of equal protection, a plaintiff must prove the existence of purposeful discrimination by demonstrating that, based on membership in a protected class, he or she received "different treatment from that received by other individuals similarly situated." Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1992); Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990). Thus, an "essential element of a claim of selective treatment under the Equal Protection Clause is that the [plaintiff has identified] comparable parties [who] were 'similarly situated.'" Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008). "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" Id. (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).

Assuming that Kazar has proven membership in one or more protected classes, her claim fails because she has not identified similarly situated individuals. Kazar has identified four individuals whom she claims were similarly situated: Stenton Danielson, John Buttermore, Kolson Schlosser, and Pavani Tallypally. None of these individuals, however, are similar to Kazar in "all relevant aspects." Id. Both Danielson and Schlosser differ from Kazar in a critically important respect: when they were hired into the Geography Department, they had their doctorates. Buttermore and Tallypally were hired

12

into an entirely different school at SRU—the School of Business—where their annual review was conducted by different faculty members, with different areas of expertise, and differing expectations for research and departmental service. Because Kazar has failed to identify an individual who was similarly situated to her, she has not met her burden to sustain a claim for denial of equal protection. Accordingly, the District Court's entry of summary judgment on Count Two will be affirmed.

D

Kazar also brings a claim against SRU for discrimination on the basis of gender in violation of Title IX.[4] The District Court dismissed this claim, concluding that since Kazar sought relief for employment discrimination, she was required to proceed under Title VII, and her claim failed because she had not exhausted her administrative remedies.[5] The District Court therefore concluded that her Title IX claim lacked merit. We agree that the Title IX claim is meritless but reach this conclusion on different grounds. See Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)

---

[4] Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).

[5] The District Court followed the reasoning set forth in Lakoski v. James, 66 F.3d 751 (5th Cir. 1995). The Lakoski court held that Title VII displaces Title IX because allowing Title IX employment discrimination claims to proceed without satisfying Title VII's exhaustion requirements would upset Congress's remedial scheme for redressing employment discrimination. Id. at 754. While Lakoski and other courts have used the word "preempt" to describe the relationship between Title IX and VII, use of that word may cause confusion. The word "preemption" is used when evaluating whether a federal law supersedes a state law under the Supremacy Clause. See, e.g., Arizona v. United States, 132 S. Ct. 2492, 2500 (2012). Here, the question involves the relationship between two federal laws and whether they may coexist or if one law displaces the other.

13

("We may affirm the District Court's order granting summary judgment on any grounds supported by the record.").

Setting aside whether Title IX may be used to bring an employment discrimination claim, Kazar has not provided evidence from which a reasonable juror could conclude that the decision not to renew her tenure-track teaching position based on her failure to timely obtain her Ph.D. was pretextual.

The standard for proving Title IX and VII gender discrimination claims is the same. See Buntin v. Breathitt Cty. Bd. of Educ., 134 F.3d 796, 800 (6th Cir. 1998); Murray v. N.Y. Univ. Coll. of Dentistry, 57 F.3d 243, 248 (2d Cir. 1995); Preston v. Commonwealth of Va. ex rel. New River Cmty. Coll., 31 F.3d 203, 206 (4th Cir. 1994); Roberts v. Colo. State Bd. of Agric., 998 F.2d 824, 832 (10th Cir. 1993); Lipsett v. Univ. of P.R., 864 F.2d 881, 896-97 (1st Cir. 1988); Mabry v. State Bd. of Cmty. Colls. & Occupational Educ., 813 F.2d 311, 317 (10th Cir. 1987); O'Connor v. Peru State Coll., 781 F.2d 632, 642 n.8 (8th Cir. 1986). Thus, we will evaluate Kazar's Title IX claim under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Under the McDonnell Douglas framework, a plaintiff claiming discrimination must first establish a prima facie case. Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 364 (3d Cir. 2008). If the plaintiff is able to establish a prima facie case, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir. 1999)

14

(quoting McDonnell Douglas, 411 U.S. at 802). If the employer meets its burden, "[t]he plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action." Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (per curiam). "[T]hroughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Even assuming that Kazar has established a prima facie case of gender-based discrimination, SRU has articulated a legitimate, non-discriminatory reason for declining to renew her tenure-track teaching contract: Kazar failed to timely complete her Ph.D. See supra at 11-12. Kazar has not shown that this reason was pretextual. As already discussed, Kazar was given multiple opportunities to fulfill the Ph.D. requirement for her position and repeatedly failed to do so. Kazar based her assertion that her non-renewal was motivated by gender on nothing more than supposition. As discussed in connection with her equal protection claim, Kazar has not identified a similarly situated male who was treated differently. Moreover, although Kazar notes that a posting seeking a replacement for her position required only a master's degree (but noted a Ph.D. was preferred), and she was replaced by a man, neither fact provides a basis to infer pretext. First, the posting was for a temporary position, different from the tenure-track position she sought. Second, the tenure-track position Kazar sought always required a Ph.D., regardless of what this temporary position required. Third, although the temporary

15

position required only a master's degree, the position was filled by an individual who had a Ph.D.  Fourth, Kazar was encouraged to apply for the position but she declined to do so.

Kazar's other arguments about a pattern of antagonism are also not borne out by the record.  In short, she has provided no evidence from which a reasonable juror could conclude that she was treated differently because of her gender.  Rather, the record supports only one conclusion: SRU decided not to renew Kazar's tenure-track contract because she failed to timely receive her Ph.D.

## III

For the foregoing reasons, we will affirm.

SHWARTZ, <u>Circuit Judge</u>, concurring.

I write separately to provide an analysis of the Supreme Court precedent relevant to whether Title VII displaces Title IX because that issue was the ground on which the District Court dismissed the case, a focus of the parties' arguments on appeal, and the specific subject about which we requested oral argument. As explained below, Supreme Court precedent supports allowing plaintiffs to pursue relief for gender-based employment discrimination at federally-funded educational institutions via Title IX regardless of whether a plaintiff has satisfied Title VII's exhaustion requirements.

First, the Supreme Court has held that, based upon its broad statutory language and legislative history, Title IX bans employment discrimination on the basis of gender, <u>N. Haven Bd. of Educ. v. Bell (North Haven)</u>, 456 U.S. 512, 525, 535-36 (1982), and provides plaintiffs a private right of action to seek damages, <u>Cannon v. Univ. of Chi.</u>, 441 U.S. 677, 696, 717 (1979).

Second, the Supreme Court has recognized that Title VII is not the exclusive means to address employment discrimination. <u>Johnson v. Ry. Express Agency, Inc.</u>, 421 U.S. 454, 459 (1975) (recognizing that while Title VII provides "a comprehensive solution for the problem[s] of invidious discrimination in employment, the aggrieved individual clearly is not deprived of other remedies he possesses and is not limited to Title VII in his search for relief"); <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 48 (1974) ("[T]he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes.").

1

Third, the Supreme Court has observed that Title IX and Title VII are "vastly different" statutes. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 175 (2005). While the two statutes address the same type of conduct, they target different offenders, have different statutes of limitations, and provide some different remedies. Moreover, they were enacted to achieve different goals: Title IX protects individuals from gender discrimination at educational institutions receiving federal funds, and Title VII compensates victims of discrimination by their employers. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 287 (1998). The Court has held that statutes with such overlapping purposes may coexist, particularly when they reach different situations, and there is an obligation to enforce both. See J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc., 534 U.S. 124, 143 (2001).

Fourth, not only are Title VII and Title IX appropriately viewed as two avenues to seek relief for employment discrimination but, as stated in the Panel's opinion, the standard for proving a Title VII claim applies to gender-discrimination claims arising under Title IX. By holding that Title VII standards apply to Title IX employment claims, our sister circuits recognize that these statutory avenues to address employment discrimination coexist.

Fifth, while the Supreme Court has held that Congress's enactment of a comprehensive scheme to address a problem may demonstrate "congressional intent to preclude" seeking remedies via other statutes, see Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 20 (1981), that principle is not applicable here because Title IX was enacted after Title VII. When Congress drafted Title IX, it was

2

aware of Title VII's administrative framework and chose not to include a similar scheme for bringing Title IX claims. See St. Louis, I.M. & S. Ry. Co. v. United States, 251 U.S. 198, 207 (1920) (stating that "Congress must be presumed to have known of its former legislation . . . and to have passed the new laws in view of the provisions of the legislation already enacted"). Instead, Congress enacted a pre-suit notification requirement. 20 U.S.C. § 1682; Gebser, 524 U.S. at 290 ("Because the express remedial scheme under Title IX is predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation, 20 U.S.C. § 1682, we conclude, in the absence of further direction from Congress, that the implied damages remedy should be fashioned along the same lines."). This intentional selection confirms that Congress meant to allow Title IX claims to be brought to court without compliance with the administrative requirements for Title VII claims. This is consistent with Congress's choices in other antidiscrimination statutes in which it does not require administrative exhaustion before filing suit. See, e.g., 29 U.S.C. § 621 (age discrimination); id. § 206(d) (equal pay). We may presume that when Congress includes an administrative scheme to address a problem in one statute and omits it from another that it does so intentionally. [1]     Cf.

---

[1] As noted in the Panel's opinion, the District Court, following Lakoski v. James, 66 F.3d 751, 754 (5th Cir. 1995), held that Title VII displaces Title IX because allowing Title IX employment discrimination claims to proceed without satisfying Title VII's exhaustion requirements would upset Congress's remedial scheme for redressing employment discrimination. While there are circumstances in which the existence of a comprehensive remedial scheme in a statute will demonstrate that Congress intended for that statute to be the exclusive avenue for relief, as explained herein, Supreme Court precedent leads to the conclusion that Title IX provides an avenue for relief for gender-based employment discrimination at federally funded educational institutions. Even though this seemingly enables employees at such institutions to avoid an administrative

3

<u>Duncan v. Walker</u>, 533 U.S. 167, 173 (2001) (discussing that when Congress includes language in one statute, but not in another, it is presumed to have intentionally included and excluded the provision).

For these reasons, Supreme Court precedent warrants concluding that Title IX provides an independent avenue that coexists with Title VII for pursuing claims of gender-based employment discrimination.

---

requirement other employees who proceed via Title VII must follow, this conclusion flows from the precedent described herein and Congress's goal in enacting Title IX to eradicate gender discrimination in places of learning.